IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

DENISE F. CLARK,

                                                    OPINION AND ORDER
                    Plaintiff,
                                                        10-cv-185-bbc
          v.

MICHAEL ASTRUE,
Commissioner of Social Security,

                    Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

      Plaintiff Denise F. Clark seeks reversal of defendant commissioner's adverse decision
that because plaintiff is not disabled, she is not eligible for Disability Insurance Benefits
under Title II of the Social Security Act, codified at 42 U.S.C. §§ 416(I) and 423(d).
Plaintiff contends that the administrative law judge erred in determining both her physical
and mental residual functional capacity.  I agree with plaintiff and will remand the case to
the commissioner for a new determination of plaintiff's residual functional capacity.


      The following facts are drawn from the administrative record (AR):

1

FACTS

A.  Background

Plaintiff was born on June 9, 1955.  She has a high school education and past relevant

work as a laboratory technician.  AR 21.  Her last insured date was December 31, 2005.

Plaintiff filed an application for disability insurance benefits on June 12, 2006,

alleging that she had been unable to work since October 1, 2000 because of bipolar disorder,

depression, anxiety disorder, neck problems, migraines and tremors.  AR 12,141.  After the

local disability agency denied plaintiff's application initially and upon reconsideration, a

hearing was held at plaintiff's request on December 15, 2008 before Administrative Law

Judge Roger W. Thomas.  The administrative law judge heard testimony from plaintiff, AR

20-53, plaintiff's husband, AR 53-60, and a neutral vocational expert, AR 62-68.  On March

3, 2009, the administrative law judge issued his decision, finding plaintiff not disabled.  AR

13-22.  This decision became the final decision of the commissioner on October 9, 2009,

when the Appeals Council denied plaintiff's request for review.  AR 4-7.

B.  Medical Evidence

1.  Physical impairments

On August 8, 2000, plaintiff had a physical examination by Dr. Douglas J. Newman,

who noted that she had had a "C5-6 discectomy."  Plaintiff reported that she was on

2

probation at work as a result of her mood swings and that she had pain and paralysis in her right upper arm. AR 317. Newman noted that since February 1998, plaintiff had gained 44 pounds and weighed 224 pounds. He diagnosed possible menopause with mood swings, periodic right arm paralysis of uncertain etiology, borderline anemia and a possible exacerbation of depression, and recommended further testing. AR 318. A computed tomography scan the next day showed mild atrophy of plaintiff's brain, principally in the frontal region. AR 316. After blood tests ruled out menopause, Newman changed plaintiff's antidepressant from Zoloft to Effexor. AR 315.

When plaintiff returned to see Dr. Newman on November 29, 2000, she reported having been fired from the job she had held for 20 years. Because Effexor was not covered by her husband's insurance, she sought a different antidepressant. Newman switched her prescription to Prozac. AR 313. He noted that she weighed 229 pounds and that her abdomen was obese but "nontender." AR 313.

On May 18, 2001, plaintiff was seen by a physician's assistant to whom she reported persistent dizziness and falling. The physician's assistant referred her to specialists. AR 311. Plaintiff was seen by Dr. Joseph Leek, an otolaryngologist, on May 24, 2001. He found no abnormalities and reassured plaintiff that nothing serious appeared to be going on. AR 308-09.

On June 12, 2001, plaintiff was seen by neurologist David L. Camenga, who noted

3

that her neurologic examination was "unrevealing." AR 305. He concluded that plaintiff might have focal epilepsy with secondary generalization leading to apparent syncope. He recommended further testing. AR 306. A June 14, 2001 eletroencephalogram was normal, with no evidence of a focal or paroxysmal abnormality. AR 304. On June 26, 2001, Camenga told plaintiff that her magnetic resonance imaging scan showed mild diffuse cerebral atrophy. AR 329. Also, he told her he did not have an explanation for her symptoms. AR 302.

On August 10, 2001, plaintiff was seen by a physician's assistant. She reported having severe headaches with some photophobia (excessive sensitivity to light) and nausea, lasting two to three days. He prescribed Imitrex for her headaches and decreased her Prozac prescription. AR 301.

In December 2002, plaintiff began seeing Dr. Sarojini Sharma. AR 293. She reported that she had chronic depression and difficulty sleeping, had stopped taking Prozac and was seeking another antidepressant. Sharma noted that plaintiff had a past medical history of chronic depression, obesity, tension headaches and anxiety, AR 293, and prescribed Paxil. AR 294. On December 17, 2002, plaintiff had a complete hysterectomy. AR 289.

On February 12, 2003, plaintiff returned to Dr. Sharma, reporting that the Paxil was not working. AR 284. Sharma concluded that plaintiff had possible bipolar disorder, discontinued Paxil and referred her to a psychiatrist. AR 285. Plaintiff saw Sharma again

4

on August 14, 2003 and reported difficulty with her weight, which was 222 pounds. She wanted a prescription for a weight loss drug. Otherwise, she reported that she was doing well. AR 280. Sharma noted that plaintiff had been struggling with obesity for a while and she prescribed a weight loss drug for plaintiff. AR 281. On September 5, 2003, plaintiff saw Sharma, complaining of acute neck pain after lifting several buckets of animal feed. AR 278.

In September 2003, plaintiff had a cervical fusion performed by Stefan J. Konasiewicz. AR 235-36. When plaintiff saw Konasiewicz after the surgery on October 20, 2003, she reported marked improvement in her symptoms, but complained of neck pain and shoulder discomfort. Konasiewicz noted that plaintiff's bulk, tone and power appeared to be normal in the lower and upper extremities. AR 235. An October 23, 2003 x-ray showed a "post-fusion" at C5-6 and a discectomy at C6-7, with a plate and screw in place. He observed the development of degenerative spurring at the back of the C4 vertebra. AR 236.

On December 11, 2003, plaintiff saw Dr. Sharma, who noted that plaintiff had lost 26 pounds in a little more than two months, using the weight loss drug. AR 275. On March 11, 2004, plaintiff saw Sharma for intermittent shakiness of her upper arms. AR 272. On examination, Sharma noted that plaintiff had no focal neurological deficits, moved her extremities well with intact reflexes and had no involuntary movements. AR 274.

On December 14, 2004, plaintiff fell on the ice, and suffered "mild" head trauma and back and neck strain.

5

In April 2005, plaintiff saw Dr. Sandy Popham, complaining of some residual pain from her fall and a history of migraine headaches.  AR 456.  Her examination was normal except for some tenderness on her scalp and in her lower back muscles.  She weighed 229 pounds.  Popham gave her some samples of Imitrex.  AR 459.  On April 19, 2005, plaintiff reported that her migraine headaches had improved dramatically with Imitrex.  AR 450.

On May 23, 2005, plaintiff went to urgent care with a migraine headache, complaining that Imitrex was causing her to vomit.  AR 270.  She was given an injection of Imitrex in conjunction with an anti-nausea medication.  Her headache pain improved.  AR 270-71.  The  next day a nurse practitioner prescribed an anti-nausea medication.  AR 445.  In June 2005, plaintiff reported to the nurse practitioner that she had had only two headaches since her last appointment and that she was very satisfied with the improvement.  The nurse practitioner noted that plaintiff was fairly obese at 242 pounds.  AR 444.

On September 7, 2005, plaintiff saw Dr. Wolcott S. Holt, a neurologist, for her migraine headaches.  Holt noted that plaintiff had a mild tremor of outstretched hands.  Plaintiff reported that she had painful headaches about once or twice a week with nausea, vomiting and light sensitivity.  Holt diagnosed migraines and bipolar disorder, which caused tremors and rebound migraine headaches on a chronic basis.  He noted that her condition was complicated by prior cervical fusions but found no evidence of "cervical radiculopathy" or "myelopathy."  He noted that she had gained 50 pounds in the last six months with

6

subsequent sleep apnea.  AR 268-69.  Holt prescribed Topomax for the migraines, hoping it would help plaintiff lose weight and control her bipolar disorder as well.  AR 269.

On September 27, 2005, Dr. Peter Franklin, a pulmonologist, examined plaintiff for sleep apnea.  AR 266.  He noted that her depression seemed well controlled but that she had been having headaches and occasional panic attacks.  Franklin noted that plaintiff had gained 70 pounds in a year and a half and weighed 246 pounds.  He recommended a sleep study.  AR 267.  The study resulted in a diagnosis of obstructive sleep apnea and a prescription for a continuous, positive airway pressure machine.  AR 247.

Plaintiff saw Dr. Holt on December 1, 2005, complaining of headaches.  Holt noted that plaintiff was moderately overweight, almost borderline obese.  A magnetic resonance imaging scan showed lower cervical stenosis with no disk protrusion or narrowing with some mild cerebrocortical atrophy.  AR 262.

On December 30, 2005, plaintiff returned to see Dr. Holt, who diagnosed her chronic anxiety bipolar disorder and chronic daily headaches.  He increased her Topomax dosage.  He noted that the airway pressure machine had improved her sleep efficiency but had not improved her headaches.  AR 260.

On December 2, 2006, Dr. Holt completed a Headaches Residual Functional Capacity Questionnaire, finding that plaintiff had chronic daily headaches and chronic migraines.  He noted that she had severe migraines two to three times a week, lasting one to two days.  He

noted that although plaintiff was not a malingerer, emotional factors contributed greatly to the severity of her headaches.  He concluded that if plaintiff was working, she would need to take daily unscheduled breaks for up to 20 minutes and would miss work more than three times a month.  AR .  Holt found plaintiff incapable of even "low stress" jobs.  AR 404-08.

2.  Mental impairments

On August 14, 2003, plaintiff saw Dr. Jayme Bork, a neurologist and psychiatrist. Although medical doctors had treated plaintiff's depression, she had never been to a psychiatrist.  AR 243.  After a mental status examination, Bork diagnosed bipolar disorder with anxiety, panic and obsessive-type tendencies.  He prescribed Lithium.  AR 344.  On November 18, 2003, Bork's nurse saw plaintiff and increased her Lithium.  AR 242.

On August 24, 2004, plaintiff saw Dr. Bork.  He noted she was struggling with "recurrent depressive disorder with a bipolar variant," AR 240, and adjusted her medication. When plaintiff returned to see Bork in December 2004, she reported being reasonably stable on medication, but said she would have to change medications because of a loss of insurance coverage.  Bork adjusted her medications.  AR 239.

Plaintiff was admitted to a psychiatric hospital on September 28, 2006 by Dr. Bork and discharged on October 6, 2006.  Her diagnoses were bipolar, obsessive-type compulsive disorder and grief reaction.  AR 395.

8

On November 27, 2006, Dr. Bork wrote to plaintiff's representative about his treatment of plaintiff. He said he had treated plaintiff intermittently since August 2003 and had hospitalized her from September 29 through October 4, 2006 but could not say whether she was disabled. He stated that she had a clear diagnosis of bipolar disorder and recurrent anxiety and depression and that her conditions interfered with her functional capacity. He stated:

> It can be inferred by the patient's difficulty in following physician recommendations and keeping scheduled appointments, as well as her intermittent medication compliance, that the patient is not even able to handle her own affairs, let alone be responsible to work consistently and function for others. Conversely, an untreated or inconsistently treated psychiatric illness such as depression or bipolar disorder does not necessarily equal disability.

AR 400-01. He concluded that at this he did not have a solid foundation upon which to base an opinion regrading her functional capacity. He suggested an independent psychiatric evaluation. AR 401.

### C. Consulting Physicians

On August 17, 2006, Dr. Marcus Desmonde, Psy. D., performed a consultative psychiatric examination of plaintiff at the request of the state disability agency. He noted that her concentration was average, her memory was intact and her judgment and insight did

9

not appear impaired.  Desmonde estimated from plaintiff's speech, vocabulary, education and past occupational experience that her IQ was approximately 120.  AR 335.  He diagnosed adjustment disorder with mixed anxiety and depressed mood and a bipolar disorder, assessing her Global Assessment Functioning as 55-65.  Desmonde concluded that plaintiff appeared capable of understanding simple and complex instructions but might have problems tolerating stress or contact with others in work environments.  AR 336.

On September 25, 2006, state agency physician Pat Chan completed a physical residual functional capacity assessment, listing diagnoses of status post cervical spine fusion, headaches and intermittent upper extremity tremors.  AR 349.  Chan found that plaintiff could lift 50 pounds occasionally and 25 pounds frequently, stand or walk six hours in an eight-hour workday and sit six hours in an eight-hour work day, but should avoid even moderate exposure to hazards, including machinery and heights.  AR 350.  On May 14, 2007, Syd Foster, a state agency physician, affirmed Chan's assessment.  AR 409.

On September 26, 2006, state agency psychologist Roger Rattan completed a Psychiatric Review Technique, diagnosing affective and anxiety related disorder.  AR 357.  He concluded that plaintiff had moderate restrictions of the activities of daily living, marked difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence and pace and no episodes of decompensation.  He saw no evidence of the presence of the "C" criteria.  AR 367-68.

10

Also, Rattan completed a mental residual functional capacity assessment for plaintiff, finding her moderately limited in her ability to (1) perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; (2) sustain an ordinary routine without special supervision; (3) work in coordination with or proximity to others without being distracted by them; (4) complete a normal workday and workweek without interruptions from psychologically based symptoms; (5) perform at a consistent pace without an unreasonable number and length of rest periods; (6) interact appropriately with the general public; (7) accept instructions and respond appropriately to criticism from supervisors; (8) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (9) respond appropriately to changes in work setting; (10) travel in unfamiliar places or use public transportation; and (11) set realistic goals or make plans independently of others.  AR 371-72.  On May 15, 2007, Keith Bauer, a state agency psychologist, affirmed Rattans's assessments.  AR 410.


D.  Hearing Testimony

At the administrative hearing, plaintiff testified that she had worked part time five or six months at a time after the alleged onset date of her disability.  AR 3-32.  Also, she testified that she and her husband raised chinchillas and rabbits and that she helped operate their pet supply business until 2004.  AR 50-51.  She had previously worked at the

11

Arrowhead Regional Blood Center as a laboratory technician for about ten years.  AR 51-52.

Plaintiff testified that she weighed about 230 pounds, had migraines two to three times a week and tremors.  AR 30, 43-44, 48-49.  She suffered neck pain, AR 46, and some joint pain in her left shoulder, right hip and left knee after a fall.  AR 40.  Plaintiff did not like to leave her motor home, did not want to go out in public without her husband and did not like working with other people.  AR 35-37, 48-49.  She testified that her husband did all the household chores.  AR 36.

Plaintiff had a psychiatric hospitalization after her date last insured.  AR. 39.  She testified that Dr. Bork had discharged her because she would not consent to electroconvulsive therapy.  AR 46.

Plaintiff testified that Topomax had been an effective medication for her headaches but that she had to stop taking it because she could not afford it. AR 43-44.

Next, plaintiff's husband, James Clark, testified that he had observed plaintiff's headaches and symptoms of her bipolar disorder.  AR 54.  He testified that plaintiff fell a lot and had shakes.  AR 57-58.  He said that he did all of the household chores and that plaintiff did not want to go out in public without him.  AR 59.

The administrative law judge called Edward Utities to testify as a neutral vocational expert.  AR 60.  Plaintiff's representative had no objections to the qualifications of Utities.  AR 61.  Utities testified that plaintiff's past work was light and semi-skilled.  AR 62.  The

12

administrative law judge asked Utities to assume an individual of plaintiff's age, work experience and the ability to perform medium work, avoiding hazards, with simple to complex instructions and only brief, superficial contacts with coworkers, supervisors and the general public.  AR 64.  Utities testified that without dealing with the public, the individual could perform 3,000 lab technician positions in Wisconsin that involved analyzing bodily fluids. AR 65-66.  He testified that the jobs were skilled or semi-skilled.  AR 64,  Also Utities testified that an individual could perform these jobs even if she could not use her neck for repetitive or constant neck flexion, extension or rotation and could not look into a microscope for the majority of a day. AR 66-67.  He testified that his testimony was consistent with the <u>Dictionary of Occupational Titles</u>. AR 67.

On cross examination, Utities testified that if an individual's frequent headaches basically incapacitated her or drastically impaired her ability to concentrate, it would be a "very negative factor" in terms of working as a medical lab technician.  Also, he testified that it would not be considered customary for the individual to have another person with her at all times.  AR 68

E.  <u>Administrative Law Judge's Decision</u>

In reaching his conclusion that plaintiff was not disabled, the administrative law judge performed the required five-step sequential analysis.  <u>See</u> 20 C.F.R. §§ 404.1520, 416.920.

13

Under this test, the administrative law judge sequentially considers 1) whether the claimant is currently employed; 2) whether the claimant has a severe impairment; 3) whether the claimant's impairment meets or equals one of the impairments listed in 20 C.F.R. § 404, Subpt. P, App. 1, 4); whether the claimant can perform his past work; and 5) whether the claimant is capable of performing work in the national economy.  <u>Knight v. Chater</u>, 55 F.3d 309, 313 (7th Cir. 1995).  If a claimant satisfies steps one through three, she is automatically found to be disabled.  If the claimant meets steps one and two, but not three, then she must satisfy step four.  *Id*.  The claimant bears the burden of proof in steps one through four.  If the claimant satisfies step four, the burden shifts to the Commissioner to prove that the claimant is capable of performing work in the national economy.  *Id.*

At step one, the administrative law judge found that plaintiff had not engaged in substantial gainful activity from October 1, 2000, her alleged onset date, through December 31, 2005, the date on which she was last insured.  At step two, the judge found that plaintiff had severe impairments, including degenerative disc disease of the cervical spine, status post discectomy and fusion at C5-6, discectomy and fusion with instrumentation at C6-7, migraine headaches, intermittent intention tremor of the upper extremities, obstructive sleep apnea and bipolar disorder with anxiety.

At step three, the administrative law judge found that plaintiff did not have an impairment or combination of impairments that met or was the medically equivalent of any

14

impairment listed in 20 C.F.R. 404, Subpart P, Appendix 1.  AR 15.  First, the administrative law judge discussed plaintiff's physical impairments, including her September 2003, cervical fusion, tremors, dizziness, falling, sleep apnea and headaches.  He concluded that these impairments were not as severe as the physical impairments listed in the regulations.

Next, the administrative law judge found that plaintiff's mental impairment did not meet Listings 12.04 or 12.06.  AR 15-16.  He found that plaintiff had only mild difficulties in the activities of daily living and in social functioning, moderate difficulties in maintaining concentration, persistence and pace and no episodes of decompensation.  In determining that plaintiff had mild difficulties in the activities of daily living, the administrative law judge stated that although she testified that her husband did most of the household chores, she reported that she had vacuumed and done laundry in the past.  Also, the judge found that the evidence failed to establish the presence or the "paragraph C" criteria.  AR 16.  The administrative law judge noted that, although the state agency psychologists found that she had marked difficulties in social functioning, they offered no supporting documentation.  In addition, the same psychologists found that plaintiff would have only moderate limitations with respect to interacting with others at work.  Also, the judge noted that the psychologist who had performed a consultative examination on plaintiff found that she would have some problems tolerating contact with others in the workplace, but would not be precluded from

15

such contact.  AR 17.

Before reaching step four, the administrative law judge found that plaintiff retained the residual functional capacity to perform medium work with no work hazards, simple to complex instructions and brief and superficial contact with others. AR 18.  In making this determination the administrative law judge found that plaintiff's impairments could reasonably be expected to cause her alleged symptoms, but that plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible to the extent they were inconsistent with his residual functional capacity assessment. AR 18.

In making his residual functional capacity assessment, the administrative law judge considered the evidence concerning plaintiff's physical impairments.  He noted that she had surgery on her neck in September 2003 after an injury but that she had significantly improved by October 2003, with only intermittent soreness by March 2004.  Also, he considered plaintiff's treatment for headaches from December 2004 to December 2005 and noted her significant improvement with medication.   The administrative law judge discounted plaintiff's testimony about having incapacitating headaches several times a week, finding that her treatment was entirely inconsistent with these symptoms.  He found that plaintiff testified that she was not taking prescription medication for headaches.   The administrative law judge discounted Holt's opinion about  plaintiff's work limitations

16

because he "merely reiterated" the plaintiff's statements regarding the frequency and severity of her headaches.  AR 19.

Next, in discussing plaintiff's mental impairments, the administrative law judge noted that in December 2004, Bork found plaintiff reasonably stable on her medications.  The judge concluded that the evidence indicated plaintiff did not have a disabling mental impairment before December 31, 2005.  The administrative law judge considered Bork's opinion that she would not be able to render a disability opinion except to say that an untreated or inconsistently treated mental illness does not necessarily equal disability.  AR 20.  The administrative law judge included the consulting psychologist's limitations that plaintiff "would be capable of simple to complex instructions, but would have problems tolerating contact with coworkers, supervisors and the public and the stress and pressure of competitive employment." Also, he noted that the state agency psychologists had found that plaintiff would have no more than moderate mental restrictions.  AR 20.

At step four, the administrative law judge found that plaintiff was not able to perform her past work.  AR 20.  At step five, relying on the testimony of the vocational expert, the administrative law judge found there were 3000 laboratory technician jobs in  Wisconsin that plaintiff could perform.  He found the expert's testimony to be consistent with the information contained in the Dictionary of Occupational Titles.  AR 21.

OPINION

A.  Standard of Review

The standard by which a federal court reviews a final decision by the commissioner is well settled:  the commissioner's findings of fact are "conclusive" so long as they are supported by "substantial evidence."  42 U.S.C. § 405(g).  Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971).  When reviewing the commissioner's findings under § 405(g), the court cannot reconsider facts, re-weigh the evidence, decide questions of credibility or otherwise substitute its own judgment for that of the administrative law judge.  Clifford v. Apfel, 227 F.3d 863, 869 (7th Cir. 2000).  Thus, where conflicting evidence allows reasonable minds to reach different conclusions about a claimant's disability, the responsibility for the decision falls on the commissioner.  Edwards v. Sullivan, 985 F.2d 334, 336 (7th Cir. 1993).  Nevertheless, the court must conduct a "critical review of the evidence" before affirming the commissioner's decision, id., and the decision cannot stand if it lacks evidentiary support or "is so poorly articulated as to prevent meaningful review."  Steele v. Barnhart, 290 F.3d 936, 940 (7th Cir. 2002).  When the administrative law judge denies benefits, he must build a logical and accurate bridge from the evidence to her conclusion.  Zurawski v. Halter, 245 F.3d 881, 887 (7th Cir. 2001).

18

B.  Residual Functional Capacity

This case is primarily about the administrative law judge's determination of plaintiff's residual functional capacity prior to her last insured date of December 31, 2005.  A claimant's "residual functional capacity" is the "individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis." Social Security Ruling 96-8p; see also 20 C.F.R. § 416.645; Young v. Barnhart, 362 F.3d 995, 1000 (7th Cir. 2004) ("The RFC is an assessment of what work-related activities the claimant can perform despite her limitations.").  A "regular and continuing basis" means "8 hours a day, for 5 days a week, or an equivalent work schedule."  Id.

In considering a claimant's residual functional capacity, an administrative law judge is expected to take into consideration all relevant evidence, both medical and non-medical, including a claimant's own statement of what she is able or unable to do.  20 C.F.R. § 416.945(a)(3).  Although medical evidence is certainly important, "[t]he determination of RFC . . . is an issue reserved to the SSA," and an administrative law judge need not consider a medical opinion conclusive.  Diaz v. Chater, 55 F.3d 300, 306 n.2 (7th Cir. 1995) (citing 20 C.F.R. §§ 404.1527(e)(2) & 416.927(e)(2)).  As with his other findings, the administrative law judge must provide a "narrative discussion" describing how the evidence supports his conclusions.  SSR 96-8p.

19

1.  <u>Physical residual functional capacity</u>

Although an administrative law judge must consider all medical opinions of record, he is not bound by those opinions.  <u>Haynes v. Barnhart</u>, 416 F.3d 621, 630 (7th Cir. 2005). "[T]he weight properly to be given to testimony or other evidence of a treating physician depends on circumstances."  <u>Hofslien v. Barnhart</u>, 439 F.3d 375, 377 (7th Cir. 2006). When a treating physician's opinion is well supported and no evidence exists to contradict it, the administrative law judge has no basis on which to refuse to accept the opinion.  <u>Id.</u>; 20 C.F.R. § 404.1527(d)(2).   When, however, the record contains well supported contradictory evidence, the treating physician's opinion "is just one more piece of evidence for the administrative law judge to weigh," taking into consideration the various factors listed in the regulation.  <u>Id.</u>  These factors include the number of times the treating physician has examined the claimant, whether the physician is a specialist in the allegedly disabling condition, how consistent the physician's opinion is with the evidence as a whole and other factors.  20 C.F.R. § 404.1527(d)(2).  An administrative law judge must provide "good reasons" for the weight he gives a treating source opinion, <u>id.</u>, and must base his decision on substantial evidence and not mere speculation.  <u>White v. Apfel</u>, 167 F.3d 369, 375 (7th Cir. 1999).

In discounting Dr. Holt's opinion that plaintiff would be incapable of even low stress jobs and would have to take unscheduled breaks and be absent more than three times a

20

month because of her headaches, the administrative law judge found that plaintiff was not taking prescription medication for her headaches and that Dr. Holt based his opinion on plaintiff's statements regarding the frequency and severity of her headaches.  His findings are flawed in two respects.

First, the administrative law judge erred by relying heavily on the fact that plaintiff was not taking Topomax for her headaches. Just before plaintiff's last insured date, on December 30, 2005, Dr. Holt increased plaintiff's dose of Topomax.  Plaintiff testified that she stopped taking the medication because she could not afford it.  Under Social Security Ruling 96-7, the administrative law judge cannot draw any inferences from an individual's failure to take prescribed medications without first considering any explanations the individual might provide.  The fact that the individual may be unable to afford treatment and may not have access to free or low-cost medical services is a legitimate excuse.  The administrative law judge erred by failing to consider plaintiff's inability to pay for Topomax as the reason she stopped taking it even though her dosage was increased.

Second, plaintiff testified that she had migraines two or three times a week.  Although the administrative law judge found that this testimony was not credible, he did not consider factors other than the medical evidence.   Under Social Security Ruling 96-7p, an administrative law judge must follow a two-step process in evaluating an individual's own description of his or her impairments:  1) determine whether an "underlying medically

21

determinable physical or mental impairment" could reasonably be expected to produce the individual's pain or other symptoms; and 2) if such a determination is made, evaluate the "intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." Social Security Ruling 96-7p, 1996 WL 374186, *1 (1996); see also Scheck v. Barnhart, 357 F.3d 697, 702 (7th Cir. 2004). When conducting this evaluation, the administrative law judge may not reject the claimant's statements regarding her symptoms on the sole ground that the statements are not substantiated by objective medical evidence. Instead, the administrative law judge must consider the entire case record to determine whether the individual's statements are credible. Relevant factors the administrative law judge must evaluate are the individual's daily activities; the location, duration, frequency and intensity of the individual's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; other treatment or measures taken for relief of pain; the individual's prior work record and efforts to work; and any other factors concerning the individual's functional limitations and restrictions. SSR 96-7p; 20 C.F.R. §§ 404.1529(c), 416.929(c). See also Scheck, 357 F.3d at 703; Zurawski, 245 F.3d at 887.

An administrative law judge's credibility determination is given special deference because that judge is in the best position to see and hear the witness and to determine

22

credibility.  Shramek v. Apfel, 226 F.3d 809, 812 (7th Cir. 2000).  In general, an administrative law judge's credibility determination will be upheld unless it is "patently wrong."  Prochaska v. Barnhart, 454 F.3d 731, 738 (7th Cir. 2004); Sims v. Barnhart, 442 F.3d 536, 538 (7th Cir. 2006) ("Credibility determinations can rarely be disturbed by a reviewing court, lacking as it does the opportunity to observe the claimant testifying."). However, the administrative law judge still must build an accurate and logical bridge between the evidence and the result.  Shramek, 226 F.3d at 811.  The court will affirm a credibility determination as long as the administrative law judge gives specific reasons that are supported by the record.  Skarbeck v. Barnhart, 390 F. 3d 500, 505 (7th Cir. 2004).

       In plaintiff's case, the administrative law judge failed to consider the entire record to determine the credibility of plaintiff's statements.  In addition to not considering the reason plaintiff no longer took the Topomax, he did not consider her daily activities.  Although the administrative law judge discussed plaintiff's daily activities at step three in determining she had only mild restrictions in her activities of daily living, he did not discuss them in determining her credibility.  From the administrative law judge's conclusion  that plaintiff had only mild restrictions on the activities of daily living, I cannot infer that he did not believe her testimony about her headaches. Further, he did not consider her husband's testimony that corroborated plaintiff's own testimony. In this case, the administrative law judge's credibility finding was particularly important because he used it to discount Dr.

23

Holt's opinion.  Given the lack of support for the administrative law judge's credibility finding, I cannot affirm it.

I am remanding this case to the commissioner for a re-determination of plaintiff's physical residual functional capacity before her last insured date of December 31, 2005.  The commissioner should consider the weight to be given to Dr. Holt's opinion, plaintiff's testimony concerning her headaches and her husband's testimony that he had observed the effect of these headaches on his wife.  Also, he should take into account the effect her other physical impairments have on her physical ability to work, including her obesity,

2. Mental residual functional capacity

Plaintiff contends that the administrative law judge erred in two ways in determining that she had the mental residual capacity to perform jobs requiring her to follow simple to complex instructions with brief and superficial contact with others.  First, he failed to properly consider the opinion of Dr. Bork, plaintiff's treating psychiatrist.  Although Dr. Bork declined to give an opinion on disability, in finding plaintiff not completely disabled, the administrative law judge relied on Bork's comment that an untreated or inconsistently treated mental illness was not necessarily equivalent to a   disability.  However, the administrative law judge did not mention the rest of Bork's opinion, in which Bork inferred from plaintiff's difficulty in following physician's recommendations, keeping scheduled

24

appointments and complying with medication that plaintiff would not be able to work consistently and function for others.  By considering only the portions of Bork's opinion that supported his conclusion, the administrative law judge failed to build an accurate and logical bridge between the evidence and his residual functional capacity finding.

Second, although the administrative law judge found at step three that plaintiff had moderate difficulties in maintaining concentration, persistence or pace, he did not include any restrictions concerning these difficulties in his residual functional capacity finding.

As plaintiff points out, the court of appeals addressed a similar issue in Craft v. Astrue, 539 F.3d 668, 677-78 (7th Cir. 2008), and Stewart v. Astrue, 561 F.3d 679, 685 (7th Cir. 2009).  In both cases, the court was critical of residual functional capacity assessments that purported to account for the plaintiff's mental limitations by restricting her to "simple, unskilled" or "simple, routine" tasks.  But see Jaskowiak v. Astrue, 2009 WL 2424213, *18 (W.D. Wis. Aug. 6, 2009) (rejecting notion that limitation to "unskilled" or "simple" work can never be sufficient to reflect person's mental limitations, provided administrative law judge considers mental abilities required of unskilled work and explains basis for finding that plaintiff has such abilities).  Plaintiff's case differs from Craft and Stewart.  In her case, the the administrative law judge did not limit plaintiff to unskilled or simple work even though he found that she had moderate limitations in maintaining concentration, persistence or pace, Rather, he found that she could perform work with simple to complex instructions and brief

25

and superficial contact with others.  However, he did not take into account her moderate limitations in maintaining concentration, persistence or pace.

In his decision, the administrative law judge found that the state agency psychologists concluded that plaintiff would have no more than moderate mental restrictions.  Although this conclusion was correct, he did not include any of these moderate mental limitations in her residual functional capacity except for limiting her contact with others.  He did not discuss the findings of Rattan, the state agency psychologist, that plaintiff was also moderately limited in her ability to  perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; sustain an ordinary routine without special supervision; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; respond appropriately to changes in work setting; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others.  These limitations would affect plaintiff's ability to perform the skilled or semi-skilled work of a laboratory technician.  It was error not to take these moderate limitations into account when determining plaintiff's residual functional capacity.

Plaintiff's limitations in concentration, persistence or pace are particularly relevant to the administrative law judge's finding that plaintiff could perform 3000 laboratory technician jobs that did not require dealing with the public.  These jobs were described by the vocational

expert as skilled or semi-skilled.  The administrative law judge erred in finding that plaintiff could perform work that did not take into account her moderate limitations in maintaining concentration, persistence or pace.

Accordingly, I am remanding this case to the commissioner to determine whether plaintiff retained the physical and mental residual functional capacity to perform work on a regular and consistent basis.  On remand, he should consider the medical evidence in the record carefully and re-assess the credibility of plaintiff's statements concerning her pain and limitations.  After determining plaintiff's residual functional capacity, he should decide whether plaintiff can perform any work available in the regional or national economy.

## C.  Step Three Determination

Although the administrative law judge could have done a better job at step three in articulating his reasons for finding that plaintiff did not have a mental or physical impairment that met a listed impairment, I can follow his reasoning.  Further, plaintiff has submitted no evidence that her impairments singly or in combination met a listed impairment.  However, because I am remanding this case on other grounds, the commissioner may reconsider his step three determination after considering all the evidence.

## D.  Other Arguments

27

_____Because I am remanding to the commissioner for a redetermination of plaintiff's physical and mental residual functional capacity, I do not need to address plaintiff's argument concerning the administrative law judge's step five determination.  The administrative law judge will have to make a new step five determination after redetermining plaintiff's residual and functional capacity.  I need not address her other arguments that the administrative law judge failed to advise plaintiff of her right to counsel, failed to develop the record fully and failed to properly consider evidence after her last insured date because the case is being remanded for a re-determination of plaintiff's residual function capacity to include consideration of all the evidence in the record.


ORDER

IT IS ORDERED that the decision of defendant Michael J. Astrue, Commissioner of Social Security, denying plaintiff Denise F. Clark's application for Disability Insurance Benefits is REVERSED AND REMANDED under sentence four of 42 U.S.C. § 405(g). The

28

clerk of court is directed to enter judgment for plaintiff and close this case.

Entered this 14th day of September, 2010.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge